UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| MICHAEL AND KATHLEEN THOMPSON, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CV-10-234-B-W ) ) |
| MICHAEL MILES AND NANCY CLOUD, | ) ) ) |
| Defendants. | ) ) |

**ORDER ON DEFENDANTS' MOTION TO DISMISS**

**I.  STATEMENT OF FACTS**

On October 14, 2008, Michael and Kathleen Thompson (Plaintiffs), Massachusetts residents, purchased Seascape, a seaside luxury home in Bar Harbor, Maine for $2,910,000 from Michael Miles and Nancy Cloud (Defendants), Maine residents.[1] *Compl.* ¶ 3, 15-18. The Plaintiffs claim that after they took possession of Seascape, they "uncovered numerous and extensive problems with the home, none of which were able to be detected on a home inspection that is typically associated with a residential property conveyance." *Id.* ¶ 5. They allege that they have been required to spend "in excess of $1 million addressing the problems, all of which are directly and proximately attributable to the Defendants." *Id.* ¶ 6. They assert that "it is highly likely that the Plaintiffs will have to spend an additional $1 million, if not more, for additional repairs and construction necessary to address the

---

[1] The Plaintiffs assert that this Court has jurisdiction pursuant to 28 U.S.C. § 1332 since the matter in controversy exceeds $75,000 and the controversy is between citizens of different states. 28 U.S.C. § 1332(a). The Defendants do not question this Court's assertion of jurisdiction.

various issues and problems that the Defendants either neglected to perform when they developed the home and/or which they were aware of but speciously failed to disclose to the Plaintiffs." *Id.* ¶ 7. The Thompsons seek damages against the Defendants for breach of contract, breach of implied covenant of good faith and fair dealing, fraud, negligent misrepresentation, promissory estoppel, and violation of the Maine Unfair Trade Practices Act (MUTPA). *Id.* ¶¶ 82-118.

On July 6, 2010, the Defendants moved to dismiss the Complaint. *Mot. to Dismiss* (Docket # 12) (*Defs.' Mot.*). On July 27, 2010, the Plaintiffs filed their opposition to the motion to dismiss. *Pls.' Opp'n to Defs.' Mot. to Dismiss* (Docket # 14) (*Pls.' Opp'n*). On August 10, 2010, the Defendants replied to the Plaintiffs' opposition. *Pls.' Resp. to Defs.' Opp'n to Mot. to Dismiss* (Docket # 16) (*Defs.' Reply*).

## II. DISCUSSION

### A. Motion to Dismiss

Rule 12(b)(6) provides, in part:

> Every defense to a claim for relief in any pleading . . . must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion: . . . (6) failure to state a claim upon which relief can be granted . . . .

Fed. R. Civ. P. 12(b)(6). "In ruling on a motion to dismiss [under Rule 12(b)(6)] a court must accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiffs." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) (citing *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 16 (1st Cir. 1998). A defendant is entitled to dismissal "only if it 'appears to a certainty that the plaintiff would be unable to

2

recover under any set of facts.'" *State St. Bank & Trust Co. v. Denman Tire Corp.*, 240 F.3d 83, 87 (1st Cir. 2001) (quoting *Roma Constr. Co. v. A Russo*, 96 F.3d 566, 569 (1st Cir. 1996)); *see also Nethersole v. Bulger*, 287 F.3d 15, 18 (1st Cir. 2002)).

Ordinarily, when a court reviews a motion to dismiss, it may not take into account documents outside the complaint. *Alternative Energy*, 267 F.3d at 33. An exception exists, however, for "documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.*; *Beddall*, 137 F.3d at 16-17. Here, Plaintiffs attached a number of documents to the Complaint, "the authenticity of which are not disputed by the parties" and which are "central to the plaintiffs' claim." *Alternative Energy*, 267 F.3d at 33. The Defendants have not disputed the authenticity of the documents, and have referred to them throughout their filings. In accordance with the *Alternative Energy* exception, the Court has considered the documents attached to the Complaint in ruling on the motion to dismiss.[2]

## B. Count I – Breach of Contract

### 1. The Defendants' Contentions

Count I alleges that the Defendants breached the Purchase and Sale Agreement and that the Plaintiffs sustained damages as a result. *Compl.* ¶¶ 82-84.

---

[2] The documents are: 1) Town of Bar Harbor Land Use & Building Permit dated January 10, 2000; 2) an article from Portland Monthly Magazine about Seascape; 3) The Swan Agency's Seascape brochure; 4) Exclusive Buyer Representation Agreement dated June 20, 2008; 5) Purchase and Sale Agreement dated August 1, 2008; 6) Purchase and Sale Agreement effective date August 4, 2008; 7) revised Purchase and Sale Agreement dated August 4, 2008; and, 8) Investigation Contingency Amendment dated September 8, 2008. *Compl.* Attach. 1-8.

3

The Defendants observe that the Purchase and Sale Agreement contains a "standard integration clause" in which the parties acknowledge that "[a]ny representations, statements and agreements are not valid unless contained herein. This Agreement completely expresses the obligations of the parties." *Defs.' Mot.* at 2. The Defendants also point out that the August 4, 2008 contract provided for an inspection of the property, that an inspection was performed, that the parties amended the Purchase and Sale Agreement on September 8, 2008, lowering the price by $190,000 to reflect necessary repairs, and that the Plaintiffs expressly agreed to purchase the residence "as is." *Id.* at 2-3. Further, the Defendants say that Maine recognizes the doctrine of "merger by deed," which provides that once a deed is accepted, "it becomes the final statement of the agreement between the parties and nullifies all the provisions of the purchase-and-sale agreement." *Id.* at 3 (quoting *Bryan v. Breyer*, 665 A.2d 1020, 1022 (Me. 1995)).

### 2. The Plaintiffs' Response

The Plaintiffs respond that in order to proceed under Maine law, they need only establish the elements of a breach of contract cause of action. *Pls.' Opp'n.* at 2. They claim the

> issue at bar is whether there has been a breach of the Agreement based on the Defendants' intentional failure to disclose material facts about the defective manner in which they constructed the property, and whether the Defendants can thereafter hide behind an 'as is' provision contained in the document that was executed after the Agreement that serves to reduce the purchase price based on the need to replace all of the windows in the house due to negligence on the part of the Defendants.

4

*Id.* at 2. They argue that the Purchase and Sale Agreement does not contain an "as is" provision concerning the real property and point to paragraph 4 of the Purchase and Sale Agreement that specifies certain personal property that they accepted in an "'as is' condition with no warranties." *Id.* They point to the Purchase and Sale Agreement that provides in paragraph 3 that "all mechanical components of fixtures will be operational at the time of closing, except: N/A." *Id.* at 3. Since they allege in their Complaint that the furnace in the guest house did not work properly, they claim that they should be allowed to prove this breach at trial. *Id.* They discount the warranty exclusion and merger by deed doctrine and assert that they "can still state a claim for breach of contract." *Id.*

### 3. Defendants' Reply

The Defendants reply that the Plaintiffs' response is "incorrect on multiple levels." *Defs.' Reply* at 2. They contend that whether the Defendants intentionally misled the Plaintiffs is an issue for the fraud claim, not the breach of contract claim. *Id.* Regarding the Plaintiffs' claim that warranties in the Purchase and Sale Agreement survived the closing, the Defendants observe that in fact no representations or warranties were made in the contract and the Agreement expressly provided that "[a]ny representations, statements, and agreements are not valid unless contained herein." *Id.* at 2-3.

The Defendants urge the Court to reject the assertion that the Amendment to the Purchase and Sale Agreement was not part of the contract, since the Amendment "specifically states that it is an amendment to the agreement dated

5

August 4, 2008 between the parties." *Id.* at 3. The Amendment, the Defendants note, expressly provides that the parties agreed the purchase price should be reduced by $190,000 - "the improvements on the property to be sold 'as is.'" *Id.* They also contend that the Plaintiffs seem to be restricting their breach of contract claim to the furnace, and the furnace fits within the definition of an "improvement, so the Plaintiffs took the furnace "as is." *Id.*

Regarding the doctrine of merger by deed, the Defendants acknowledge that in *Wimmer v. Down East Props., Inc.*, 406 A.2d 88, 91 (Me. 1979), the Maine Supreme Judicial Court distinguished between agreements part of and agreements collateral to the undertaking to convey property. Thus, in *Wimmer*, an agreement to construct a house was deemed collateral to a promise to convey the premises and the merger by deed doctrine was inapplicable. *Id.* Here, Defendants claim, Seascape was not under construction, the house had been standing for five years, and the furnace was not collateral to the conveyance. *Defs.' Reply* at 4-5. Thus, they say the doctrine of merger by deed applies.

4.  Discussion: Count I: Breach of Contract

    a.  Merger By Deed

In *Bryan v. Breyer*, the Maine Supreme Judicial Court defined the doctrine of merger by deed as providing that "once a . . . deed is accepted, it becomes the final statement of the agreement between the parties and nullifies all provisions of the purchase-and-sale agreement." 665 A.2d 1020, 1022 (Me. 1995) (citation omitted). At the same time, the Maine Law Court has clarified that "[c]ollateral agreements

6

in a purchase and sale contract do not merge into the deed." *Waterville Indus., Inc. v. Finance Auth. of Me.*, 2000 ME 138 ¶ 16, 758 A.2d 986, 990; *Wimmer*, 406 A.2d at 91. An agreement is collateral if it is not "connected with the title, possession, quantity, or emblements of the land."[3] *Id.* (citation omitted). One court described a collateral agreement as calling for "acts by the seller which go beyond merely conveying clear title and placing the purchaser in possession of the property." *Amer. Nat'l Self Storage, Inc. v. Lopez*, 521 So. 2d 303, 305 (Fla. 3d Dist. Ct. App. 1988).

In their Complaint, the Plaintiffs list the deficiencies with Seascape that have required the expenditure of substantial money: 1) the installation of a retaining wall, 2) the replacement of an outdoor deck, 3) removal of mold, 4) the correction of interior and exterior rot, 5) the removal of all exterior shingles to replace substandard structural framing and wall sheathing, 6) the replacement of all exterior shingles, 7) the removal of all windows to reinstall improperly installed flashing and sealants, 8) the removal and replacement of the air conditioning room foundation, and 9) the need to address other problems with the house caused by Defendants' substandard workmanship. *Compl.* ¶ 10. The Complaint goes on to allege that "to address and remedy the numerous problems that exist, the Plaintiffs have had to rip apart the majority of the house and rebuild the structure as if the structure was being rebuilt." *Id.* ¶ 11. They allege that they have received

---

[3] According to Black's Law Dictionary, "emblements" are the "growing crop annually produced by labor, as opposed to a crop occurring naturally." Black's Law Dictionary 599 (9th ed. 2009).

estimates that it will cost "an additional $1 million to address all of the various issues." *Id.* ¶ 12.

Further in the Complaint, the Plaintiffs allege that the house was not built to applicable building codes; that its barrier footings are undermined due to poor construction necessitating a retaining wall; that the foundation was not properly constructed; that the outdoor deck had structural and support problems; that the house lacked proper flashing, sheathing and water protection; that the exterior cedar shingles were contaminated with mold; that the trim work was not properly secured; that the furnace was improperly constrained in the guest house in violation of applicable code and without proper ventilation; and, that the exterior walls and flooring system were contaminated with mold. *Id.* ¶ 55(a)-(i).

Taking all these allegations as true for purposes of the motion to dismiss, none of the deficiencies the Plaintiffs identified is "connected with the title, possession, quantity, or emblements of the land." *Waterville Indus.*, 2000 ME 13 ¶ 16, 758 A.2d at 990. Formulated differently, the remedy for these deficiencies would call for "acts by the seller which go beyond merely conveying clear title and placing the purchaser in possession of the property." *Amer. Nat'l*, 521 So. 2d at 305; *see Mallin v. Good*, 417 N.E.2d 858, 859 (Ill. App. 1981) (concluding that covenants that "all heating, plumbing, electrical and air conditioning would be in working order at the time of closing" were collateral undertakings, incidental to the transfer of title); *Caparrelli v. Rolling Greens, Inc.*, 190 A.2d 369 (N.J. 1963) (concluding that a seller's warranty that a paneled section of basement was habitable and usable for

normal daily activity deemed to be collateral undertaking which survived delivery and acceptance of deed). Because Plaintiffs' claims are based in collateral agreements between the parties, the "doctrine of merger" does not bar the Plaintiffs' breach of contract action.

### b. Breach of Purchase and Sale Agreement

The question turns to whether in view of the language in the Investigation Contingency Amendment, the Plaintiffs have stated a claim for breach of the Purchase and Sale Agreement or whether the modification means that in exchange for a $190,000 reduction in purchase price, the Plaintiffs accepted all the property "as is."

In response, the Plaintiffs point to a provision in the Purchase and Sale Agreement that addresses mechanical components:

> Seller represents that all mechanical components of fixtures will be operational at the time of closing except: NA.

*Pls.' Opp'n.* at 3 (quoting *Compl.* Attach. 5 ¶ 3 (Docket # 1) (*P&S Agreement*)). The Plaintiffs claim that a furnace is a fixture and they say that paragraph 55(h) alleges that "the furnace was improperly constrained in the guest house in violation of applicable code and without proper ventilation thereby causing dangerous carbon monoxide production." *Id.* (citing *Compl.* ¶ 55(h)).[4]

---

[4] The Plaintiffs also say the Defendants' "intentional failure to disclose material facts about the defective manner in which they constructed the property" amounts to a breach of contract. *Pls.' Opp'n.* at 2. The Defendants observe that the intentionality is a fraud argument. The Court agrees that at least the way the Plaintiffs have phrased this part of their argument, it sounds more in fraud than in contract.

9

The Defendants respond first that "[n]o representations or warranties were made in the contract." *Defs.' Reply* at 3. They point out that paragraph 19 of the Purchase and Sale Agreement contains an integration clause. *Id.* As regards the furnace, however, this argument is a non-starter. First, the Purchase and Sale Agreement expressly defines "fixture" to include "heating sources/systems." *P&S Agreement* ¶ 3 (stating "FIXTURES: The Buyer and Seller agree that all fixtures, including but not limited to existing . . . heating sources/systems . . . are included with the sale"). Second, the Purchase and Sale Agreement specifically provides that the Seller is representing that the fixtures will be operational at the time of closing, and in the Complaint, the Plaintiffs have alleged that the furnace in effect was non-operational. *Id.*; *Compl.* 55(h). Even if the integration clause is applied, the Plaintiffs have stated a cause of action for a breach of the Purchase and Sale Agreement.

The Defendants next say that the September 8, 2008 Amendment to the August 4, 2008 Purchase and Sale Agreement amended the Agreement to eliminate any claim the Plaintiffs had for a non-operational furnace. *Defs.' Reply* at 3. Specifically, they quote the clause in the Investigation Contingency Amendment that states: "Reduce purchase price by $190,000, the improvements on the property to be sold 'as is'." *Id.* (quoting *Compl.* Attach. 8 at 2 (Docket # 1) (*Contingency Am.*)). They say that a furnace is an "improvement" and therefore the Plaintiffs accepted it "as is." *Id.*

10

An analysis of the language of the Purchase and Sale Agreement and the Investigation Contingency Amendment reveals that the Defendants are incorrect. The Investigation Contingency Amendment reads:

> Without waiving the right to proceed under the original terms of the Agreement or to declare the Agreement null and void by reason of an unsatisfactory investigation (unless the Modification/Termination section from below is signed by Buyer), Buyer hereby requests the following modifications to the Agreement:
> **Reduce purchase price by $190,000, the improvements on the property to be sold "as is", satisfactory investigation re, other rights over Graff Road + rights affecting southerly septic leach field easement within 7 business days.**
> If the above modifications are agreed to by Seller, Buyer agrees that the Agreement will no longer be conditioned on paragraph **12**, sub **a.b.g.i.** By signing below, Seller hereby agrees to the above modification to the Agreement, all other terms and conditions to remain in full force and effect.

*Contingency Am.* By its terms, therefore, the Investigation Contingency Amendment makes the Agreement "no longer conditioned on paragraph 12(a), (b), (g) [and] (i)," and "all other terms and conditions . . . remain in full force and effect."

Paragraph 12 reads:

> 12. DUE DILIGENCE: Buyer is encouraged to seek information from professionals regarding any specific issue or concern. Neither seller nor Licensee makes any warranties regarding the condition, permitted use or value of Sellers' real or personal property. This Agreement is subject to the following investigations, with results being satisfactory to Buyer:

*P&S Agreement* ¶ 12. Paragraph 12 lists nineteen types of investigation – a through s - from environmental scan to code conformance. Of the nineteen types of investigations only eight were marked. These included: subparagraph (a) General Building, (b) Chimney, (d) Sewerage Disposal, (e) Water Quality, (f) Water

11

Quantity, (g) Air Quality, (i) Mold, and (r) Insurance. Paragraph 12 goes on to provide that the buyer may choose and pay for an inspection and if the result is unsatisfactory, the buyer has the right to declare the Agreement "null and void." *Id*. If the buyer does not notify the Seller that an investigation is unsatisfactory, the contingency is waived. Paragraph 12 provides that in the absence of an investigation, the buyer "is relying completely upon Buyer's own opinion as to the condition of the property." *Id*.

A straightforward reading of the Purchase and Sale Agreement and the Investigation Contingency Agreement is that by paying the Defendants $190,000 less, the Plaintiffs waived their right to have a general building, chimney, air quality, and mold inspection, and to have the Agreement declared void depending on the results of those inspections. Even if some of the Plaintiffs' areas of complaint fall within these subparagraphs, the Investigation Contingency Amendment provides that "all other terms and conditions . . . remain in full force and effect." *Contingency Am*. This means that the provision in the Purchase and Sale Agreement, which required that "all mechanical components of fixtures will be operational at the time of the closing" is still effective, and as the furnace falls within the meaning of fixture and as the Plaintiffs have alleged in effect that the furnace was inoperable, the breach of contract claim survives the motion to dismiss. *P&S Agreement* ¶ 3. To rule on the motion to dismiss, the Court need not decide whether all aspects of the Plaintiffs' Complaint would survive a more tightly drawn dispositive motion.

## C. Count II: Implied Covenant of Good Faith and Fair Dealing

Count II asserts that the Purchase and Sales Agreement "carries with it an implied covenant of good faith and fair dealing" and that the Defendants breach that covenant. *Compl.* ¶¶ 85-88. Defendants correctly state that Maine law does not recognize an implied duty of good faith and fair dealing in the context of the purchase and sale of real estate. *Defs.' Mot.* at 3-4.

The Plaintiffs acknowledge that "Maine law only recognizes the implied covenant of good faith and fair dealing in contracts that involve insurance or contracts under the Uniform Commercial Code." *Pls.' Opp'n.* 3. However, they correctly claim that "in Massachusetts, the covenant is implied in all contracts." *Id.*; *see Liss v. Studeny*, 879 N.E.2d 676 (Mass. 2008); *Kerrigan v. Boston*, 278 N.E.2d 387, 393 (Mass. 1972) (stating that "[e]very contract implies good faith and fair dealing between the parties to it"); *Law Offices of Jeffrey S. Glassman v. Palmisciano*, 690 F. Supp. 2d 5, 17 (D. Mass. 2009). The Plaintiffs thus argue that "the question becomes which state's law is applicable." *Pls.' Opp'n.* 3.

The Plaintiffs point out that they initiated this cause of action in the commonwealth of Massachusetts and that it was removed by joint motion to the District of Maine. *Id.* They concede as Maine is the forum state, its choice of law principles apply. *Id.* at 3. Applying Maine choice of law principles, they claim Massachusetts law must apply. *Id.* at 4.

The Court disagrees. The Purchase and Sale Agreement expressly provides that Maine law controls:

13

> This is a Maine contract and shall be construed according to the laws of the Maine.

*P&S Agreement* ¶ 26. Under Maine law, the courts will enforce a contractual choice of law provision

> "unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no reasonable basis for the parties' choice, or (b) the application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue. . . ."

*Schroeder v. Rynel, Ltd.*, 1998 ME 259, ¶ 8, 720 A.2d 1164, 1166 (quoting Restatement (Second) Conflicts of Laws § 187(2) (1971)). In this case, the state of Maine has a substantial relationship to the parties and the transaction since the property which is the subject of the sale is located in the state of Maine.[5] Furthermore, although the Plaintiffs have contended that Massachusetts law should apply, they have not suggested that application of Maine law to the Plaintiffs' case would be contrary to a fundamental policy of the commonwealth of Massachusetts. *Pls.' Opp'n* at 4 (contending that "only the property itself has a relationship to Maine"). Massachusetts is the state of residence for the Plaintiffs and they say that the Purchase and Sale Agreement was signed there, but at the time of the transaction, the Defendants were living in Maine, the property was located in Maine, the Plaintiffs traveled there to inspect it, the brokers are located in Maine, the applicable building codes are for Bar Harbor, Maine, and the contract

---

[5] In addition, the Defendants are for purposes of this motion Maine residents. Although the Plaintiffs now assert that the Defendants are residents of Florida, the Complaint alleges they are Maine residents. *Compl.* ¶¶ 17, 18. In ruling on a motion to dismiss, the Court assumes the truth of the allegations in the Complaint.

provides that it will be interpreted under Maine law, The Court concludes that there is no showing that Massachusetts has a materially greater interest than Maine in the determination of the case. The Court will apply the law of the state of Maine to the Plaintiffs' case, and because Maine does not recognize a covenant of good faith and fair dealing in the purchase and sale of residential property, Plaintiffs' Count II does not state a claim upon which relief may be granted.

### D. Count V: Promissory Estoppel

In Count V, the Plaintiffs alleged a claim of promissory estoppel, stating that the Defendants "made certain material representations and omissions to the Plaintiffs in order to induce the Plaintiffs to enter into the P&S Agreement" and "caused the Plaintiffs to take reasonable action and alter their position to their detriment in reliance upon the Defendants' material representations and omissions resulting in substantial damage to the Plaintiffs." *Compl.* ¶ 110-11. The Defendants moved to dismiss this Count on the ground that "[p]romissory estoppel does not apply in a contract situation." *Defs.' Mot.* at 4 (citing *La Grange v. Datsis*, 46 A.2d 408 (Me. 1946) and *Harvey v. Dow*, 2008 ME 192, 962 A.2d 322). In response, the Plaintiffs state:

> To the extent the Court deems the Agreement to be a fully integrated and enforceable contract, the Thompsons will defer to the Court as to whether Count IV should survive.[6] Nothing herein, however, should be construed by the Court and/or the Defendants to amount to any wavier or release of the Thompson's claims for fraud, negligent misrepresentation and/or intentional misrepresentation. To the contrary, The Thompsons waive nothing.

---

[6] The Plaintiffs miscited Count IV, which is a count for negligent misrepresentation, for Count V, which is for promissory estoppel. *Compl.* ¶¶ 99-112.

15

*Pls.' Opp'n.* 5.

In their response, the Plaintiffs all but concede the Defendants' argument. They do not object to the Defendants' points of law; they cite no statutory or case law, and do not argue that the Defendants are incorrect. Yet, the Plaintiffs insist they "waive nothing." They are wrong. The Court disregards the Plaintiffs' argument, to the extent one was made, against this part of Defendants' motion. *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999) (stating that the "district court is free to disregard arguments that are not adequately developed").

### E.  Count VI:  Unfair Trade Practices Act

In Count VI, the Plaintiffs allege that the "Defendants engaged in unfair and deceptive acts or practices with their substandard construction and development of Seascape, coupled with their failure and refusal to disclose all material information to the Plaintiffs and instead misleading the Plaintiffs concerning the nature and scope of the defects with the property." *Compl.* ¶ 114. They allege that the Defendants' conduct was intentional. *Id.* ¶ 115. They further allege "[a]s a result of the Defendants' violations of UTPA," that the Defendants benefitted financially, and that the Plaintiffs have suffered harm and damage. *Id.* ¶¶ 116-18.

The Defendants move to dismiss Count VI because they did not engage in a trade or commerce and because the purchase of Seascape was not primarily for personal, family, or household purposes. *Defs.' Mot.* at 5-6. The Plaintiffs respond that they have a "good faith basis to expect to establish that the Defendants had

16

similarly constructed and sold a prior residence in the past, and therefore, the transaction at issue is not necessarily a one-time, private real estate transaction as the Defendants contend." *Pls.' Opp'n.* at 5. They dismiss the consumer transaction claim as being "simply without merit." *Id.* at 6.

The Court concludes that these issues would be better raised with a factual context. The Plaintiffs' allegations that the Defendants built and sold Seascape in violation of the Unfair Trade Practices Act, taken together, are sufficient to survive a motion to dismiss. It remains to be seen whether the Plaintiffs will be able to withstand a later dispositive motion in which the underlying facts are more fully developed.[7]

### F. Kathleen Thompson

The Plaintiffs consist of both Michael Thompson and Kathleen Thompson. *Compl.* ¶ 1. The Defendants move to dismiss Kathleen Thompson on the ground that "she was not a party to the transaction that is the subject of the Complaint." *Defs.' Mot.* at 6-7. The Plaintiffs respond that even though Ms. Thompson was not a party to the transaction itself, she was an intended third party beneficiary. *Pls.' Opp'n.* at 7-8. They point out that she was "a signatory and a party to the Exclusive Buyer Representation Agreement with the broker, The Swan Agency." *Id.* at 7. They also claim that the "Defendants and their real estate broker knew that Mrs. Thompson was going to reside in and use the property with Mr. Thompson." *Id.*

---

[7] *Campbell v. First Am. Title Ins. Co.*, 644 F. Supp. 2d 126, 134 (D. Me. 2009), a case cited by Defendants, is not to the contrary. In *Campbell*, the Court denied the Defendant's motion to dismiss. *Id.* at 129.

17

The parties acknowledge that for determining whether a person is a third party beneficiary, Maine has adopted the provisions of § 302 of the Restatement (Second) of Contracts:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
> (a) The performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
> (b) The circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*F.O. Bailey Co. v. Ledgewood, Inc.*, 603 A.2d 466, 468 (Me. 1992) (citing Restatement (Second) Contracts § 302 (1981). To prevail on their third party beneficiary contract claim, the plaintiffs have to demonstrate "that the promisee . . . intended to give the plaintiffs the benefit of the performance." *Id.* "Such an intention is gathered from the language of the written instruments and the circumstances under which they were executed." *Id.* If the contract language is "ambiguous or uncertain, its interpretation is a question of fact to be determined by the factfinder, but when the language is clear, it is a question of law and can be resolved by the court." *Id.*

The Maine Supreme Court clarified in *F.O. Bailey* that "it is not enough for plaintiffs to show that they benefitted from the contracts." *Id.* An "incidental beneficiary cannot sue to enforce a third party beneficiary rights. In order to proceed as third party beneficiaries on a contract theory, plaintiffs must generate a

genuine issue of material fact on the issue of [the promisee's] intent that they receive an enforceable benefit under the contract[]." *Id.*

In analyzing this issue, the Court first looks to the language of the agreement itself. *See Devine v. Roche Biomedical Lab.*, 659 A.2d 868, 870 (Me. 1995). Here, there is no language in the Purchase and Sale Agreement or the Investigation Contingency Amendment that "indicates [the Defendants'] intent to benefit third parties." *Id.*; *Denman v. Peoples Heritage Bank*, 1998 ME 12 ¶ 9, 704 A.2d 411, 414-15 (stating that "[t]here is no language in the contract before us to generate an issue of Peoples' intention to create in plaintiff enforceable rights as an intended beneficiary").

"In the absence of contract language, there must be circumstances that indicate with clarity and definiteness that [the promisee] intended to give [a third party] an enforceable benefit under the contract." *Devine*, 659 A.2d at 870. The *Devine* Court cautioned:

> In assessing the relevant circumstances, courts must be careful to distinguish between the consequences to a third party of a contract breach and the intent of a promisee to give a third party who might be affected by that contract breach the right to enforce performance under the contract. If consequences become the focus of the analysis, the distinction between an incidental beneficiary and an intended beneficiary becomes obscured. Instead, the focus must be on the nature of the contract itself to determine if the contract necessarily implies an intent on the part of the promisee to give an enforceable benefit to a third party.

*Id.*

Applying these principles, the Court readily concludes that Kathleen Thompson is not a third party beneficiary to the Purchase and Sale Agreement.

She is not mentioned in the Agreement and there is no suggestion that the Defendants intended to contractually benefit Ms. Thompson by agreeing to sell Seascape to Mr. Thompson. Ms. Thompson as Mr. Thompson's spouse may have benefitted from his purchase of Seascape but the benefit was incidental to his purchase. Thus, as Ms. Thompson's beneficial relationship to Seascape is solely as a spouse, to hold that she is a third party beneficiary would make a purchaser's spouse the third party beneficiary to any contract to purchase residential real estate, a proposition for which there is no authority.

The Court concludes that Kathleen Thompson is not an appropriate party Plaintiff to the pending action.

## III. CONCLUSION

The Court GRANTS in part and DENIES in part the Defendants' Motion to Dismiss (Docket # 12). The Court GRANTS Defendants' Motion to Dismiss Counts II and V and to Dismiss Kathleen Thompson as a party Plaintiff; the Court otherwise DENIES Defendants' Motion to Dismiss.

SO ORDERED.

/s/ John A. Woodcock, Jr.  
JOHN A. WOODCOCK, JR.  
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 27th day of September, 2010