UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

MICHAEL THOMPSON                )
                               )
          Plaintiff,           )
                               )
v.                             )    1:10-cv-00234-NT
                               )
MICHAEL MILES, et al.,         )
                               )
          Defendants           )

**RECOMMENDED DECISION
and
ORDER ON MOTION TO STRIKE
(Doc. No. 44)**

In October 2008, Michael Thompson purchased a 2.9 million dollar residence known as

Seascape, located in Bar Harbor, Maine, overlooking Frenchmen's Bay and the Porcupine

Islands, from Michael Miles and Nancy Cloud. Thompson has now sued Miles and Cloud,

claiming numerous deficiencies in the property related to design and construction that were

wrongfully concealed from him by the defendants. Miles and Cloud have filed a counterclaim

seeking an award of attorney fees based upon a provision of the parties' purchase and sale

agreement.[1] Thompson's complaint currently contains claims for breach of contract, fraud,

negligent misrepresentation, and violation of the Unfair Trade Practices Act. Both defendants

have moved for summary judgment on all counts. Thompson concedes that the Unfair Trade

Practices Act claim cannot go forward because the defendants were not engaged in trade or

commerce in connection with the circumstances surrounding the development, construction and

sale of Seascape. (Pl.'s Opposition at 1 n.1, Doc. No. 35.) Thompson opposes the motion in all

---

[1] The counterclaim is not the subject of a dispositive motion. The defendants request a hearing on the
counterclaim, should they be granted summary judgment on the complaint. (Mot. Summ. J. at 17, Doc. No. 30.)

other respects.  I now deny the motion to strike associated with the parties' evidentiary presentation.  I recommend that the Court grant Defendants' motion.

## STATEMENT OF THE FACTS

The non-moving party is entitled to have the summary judgment facts considered in the light most favorable to his cause.  Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011).  Because many factual disputes depend on circumstantial evidence, to determine whether a fact is established, circumferentially, the Court will draw all reasonable inferences in favor of the non-movant that can be supported by the record sources he cites.  However, where the non-movant bears the burden of proof, he still must present "definite, competent evidence" from which a reasonable person could find in his favor.  Torrech-Hernandez v. GE, 519 F.3d 41, 47 n.1 (1st Cir. 2008).  By local rule, summary judgment facts are introduced by means of "a separate, short, and concise statement of material facts," which statements must be supported by record citations.  D. Me. Loc. R. 56(b), (c).  The Court's review of the record is guided by the moving party's statement, the non-moving party's opposing statement, including any additional statement, and the moving party's limited reply statement.  D. Me. Loc. R. 56(b), (c), (d);  see also Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).  The following statement is drawn from Defendants' Statement of Material Facts (DSMF, Doc. No. 31), Plaintiff's Statement of Material Facts (PSMF or PSAMF[2], Doc. No. 36), and Defendants' Reply Statement (DRS, Doc. No. 40).

Michael Miles and Nancy Cloud have been innkeepers since 1978.  In 2000, Miles and Cloud purchased the land for the property that has become known as Seascape.  When they purchased the land for Seascape, they were planning on building a house to be their personal

---

[2]     Plaintiff's Local Rule 56(c) statement contains both a responsive statement and a statement of additional facts.  Because the latter statements are not numbered consecutively to the former statements—both beginning with paragraph 1—I refer to the former statement as "PSMF" and the latter as "PSAMF."

residence. Miles and Cloud had never built and sold other real estate properties, although they have sold two other properties, a residential house in Massachusetts in the 1970s and an inn called Ledgelawn Inn in 2005. They had done some renovations to Ledgelawn Inn with a builder. Nancy Cloud has had no experience with construction, design, permitting, carpentry, architecture, engineering, or surveying. Nancy Cloud has never been involved with construction projects of property that she owned. At the completion of construction, the Code Enforcement Officer issued a certificate of occupancy for Seascape. (DSMF ¶¶ 1-7, 72.)

Michael Miles asserts that he had no prior employment experience in construction, real estate, permitting, carpentry, architecture, engineering, or surveying. (Id. ¶ 8.) Nevertheless, during the initial application for a building permit, as well as during the design, development, and construction of Seascape, Miles acted as the "general contractor" by hiring, supervising (to some degree), and paying virtually all of those subcontractors who worked on the project. (PSMF ¶ 9.) Michael Thompson did not know that Michael Miles had listed himself as the general contractor in the application for the permit to the Town of Bar Harbor until after the closing on the property. (DSMF ¶ 72.) Nancy Cloud and Michael Miles hired Michael Gallant to do construction work in connection with the erection of Seascape. (Id. ¶ 10.)

For a design plan for the house, Nancy Cloud and Michael Miles purchased an architectural design prepared by Stephen Fuller. Michael Miles and Nancy Cloud never met with Stephen Fuller, nor did they ever hire him as an architect to design Seascape. (Id. ¶ 11.) Michael Miles made some modifications to the Fuller plans. (Id. ¶ 12.) Miles discussed his modifications to the Fuller plans with Michael Gallant to see if they could be implemented. (Id. ¶ 13.) Nancy Cloud did not supervise Michael Gallant in the construction of Seascape. (Id. ¶

14.)  Nancy Cloud was not involved with applying for or obtaining any permits from the Town of Bar Harbor for the construction of Seascape.  (Id. ¶ 15.)

On the permit application for building Seascape, Michael Miles listed himself as owner and general contractor.  (Id. ¶ 16.)  Miles completely relied upon Michael Gallant to build Seascape according to code, in spite of listing himself as the general contractor.  (Id.)  Michael Miles hired the subcontractors for Seascape such as the mason and the electrician, although Gallant did recommend two individuals for carpentry positions.  (Id. ¶ 18;  PSMF ¶ 18.)  Miles and Cloud hired Timothy Gott to pour the foundation for Seascape.  (Id. ¶ 19.)  Miles and Cloud were not present when the foundation was poured.  (Id. ¶ 20.)

During the time of Seascape's construction, Michael Miles and Nancy Cloud lived in Florida part of the year and when in Maine during the warmer season they would reside in Bar Harbor while operating two inns located in the town.  When in Maine, Michael Miles would stop by Seascape to see how construction was progressing.  (Id. ¶ 22.)  Cloud and Miles lived at Seascape in the summer seasons of 2002, 2003, and 2004.  (Id. ¶ 23.)  In 2004, they decided to list Seascape for sale.  (Id. ¶ 24.)  After 2005, Nancy Cloud and Michael Miles had very little to do with Seascape.  Michael Gallant acted as the caretaker of the property, but Cloud and Miles continued to own and control the premises and they rented the property to various tenants.  (Id. ¶ 25.)

In early August 2008, Michael Thompson as purchaser and Michael Miles and Nancy Cloud as sellers entered into an agreement regarding the property known as Seascape for the purchase price of $3,100,000.00.  (Id. ¶ 26.)  Michael Thompson used Gail Caruso as his real estate broker for this transaction.  (Id. ¶ 27.)  Michael Thompson's wife, Kathleen Thompson, was involved in the purchase process and had contact with Gail Caruso.  (Id. ¶ 28.)

On August 8, 2008, Bill Barter from Downeast Home Inspections conducted an inspection of the house on behalf of Michael Thompson.  (Id. ¶ 32.)  A copy of his report regarding the main house is part of the record.  In his report, Bill Barter noted the following:

> This is basically a good quality home that has suffered from apparent deferred/inappropriate maintenance and some inappropriate choices of materials, components, and building techniques during construction.  *Because many of the conditions and recommendations found in this report are unusual for a relatively new home of this size, type, and location it would be prudent to consult with a qualified general contractor and possibly other trades people prior to committing to purchase of the home."*

(Id. ¶¶ 33-34 (emphasis in original).)  Barter noted concerns with leaking and interior damage at the copper entrance canopy and a portion of the asphalt roof, damage to the downspouts and poor control of roof runoff, the exterior of the house, and the doors and windows.  (Id. ¶ 35.)  Barter noted concerns with the masonry fireplaces including the damper in the main living room being broken and all of the masonry fireplaces showing evidence of moisture penetration.  He recommended that all of the chimneys and fireplaces be inspected and repaired.  (Id. ¶ 36.)  Barter expressed concerns with the porch and deck including that the deck/porch appeared to be haphazardly designed and constructed with what appeared to be inadequate floor support and Barter recommended that the deck/porch be evaluated by a qualified engineer or builder.  (Id. ¶ 37.)  Bill Barter expressed concerns with water damage in the following areas: the front foyer and lower level hallway outside the boiler room; the bamboo floor in the lower level bathroom; the area adjacent to the toilet in the lower level bathroom; and the basement.  (Id. ¶ 38.)

On August 8, 2008, Barter also conducted an inspection of the carriage house/garage on behalf of Michael Thompson.  (Id. ¶ 39.)  In his report, Barter conveyed his concerns with the water heater in the carriage house noting that it was noisy and an exhaust smell occurred during use.  He recommended that the heater should be inspected.  (Id. ¶ 40.)  Barter noted concerns

with the interior windows and doors in the carriage house including that the windows and doors were of general modest quality and there was significant water damage under the window on the upper level of the carriage house. (Id. ¶ 41.) In his report, Bill Barter noted water staining and water damage in several locations of the carriage house. (Id. ¶ 42.) Barter noted water damage to the overhead garage door and damage, decay and fungi at the door adjacent to the overhead garage door. (Id. ¶ 43.)

On August 19, 2008, Michael Ross, Esq. wrote a letter on behalf of Michael Thompson to Michael Miles and Nancy Cloud regarding the inspection of Seascape and the pending sale. Thompson was copied on this letter. (Id. ¶ 29.) In the letter, Attorney Ross noted that Thompson had several questions with regard to insulation, building materials, etc., and that he would like the opportunity to ask questions of the builder and all of the subcontractors regarding the home inspector's concerns. (Id. ¶ 30.) Ross referenced the home inspection prepared by Bill Barter and noted it contained several areas of concern. (Id. ¶ 31.) On September 3, 2008, Kathleen Thompson sent an email to Attorney Ross, with copies to her husband and Gail Caruso, concerning the inspections of the property and estimates for repairs. (Id. ¶ 44.) In her email, Kathleen Thompson noted issues with replacing all of the windows and doors due to water leakage, water damage, and other issues. (Id. ¶ 45.) She also noted issues with the deck including a missing column, sagging boards, stringers too far apart, and rotting posts/caps. (Id. ¶ 46.) Thompson noted issues with the furnace in the Carriage House and that it needed replacement/reventing. (Id. ¶ 47.) She also called attention to a need for mold removal and repair of the carriage house ceiling due to water damage. She also stated that they were unable to determine the extent of damage within the ceiling. (Id. ¶ 48.) Kathleen Thompson also expressed concern about additional items including the broken damper in the living room,

efflorescence in fireboxes due to moisture penetration, ventilation in the master bath with black mildew/mold, loose railings, water damage on the hardwood floor of the foyer, wall damage due to water in several areas of the home, and the water heater in the Carriage House venting inside the building. (Id. ¶ 49.) Michael Thompson never communicated directly with Miles and Cloud. (Id. ¶ 50.) All communications from Michael Miles and Nancy Cloud during these negotiations to Michael Thompson came from their real estate brokers, Pat Coston and possibly Kim Swan. (Id.)

Michael Miles and Nancy Cloud had previously signed a Seller's Property Disclosure in September 2007, which disclosure was provided to Michael Thompson. Thompson alleges that Miles and Cloud failed to include material information concerning Seascape that they knew at the time they signed the document. (Id. ¶ 51; PSMF ¶ 51; Sept. 2007 Disclosure, Doc. No. 30-7.) In response to questions from Michael Thompson after he had the property inspected in July 2008, Pat Coston sent an email to Gail Caruso, Michael Thompson's broker, answering certain specific questions. (Id. ¶ 52.) In the email dated July 17, 2008, in response to a question concerning the signs of water damage in the main house front hallway, upstairs laundry area, and basement area, Pat Coston stated on behalf of Michael Miles and Nancy Cloud: "Last winter we had an ice dam in the valley over the laundry room which caused water to go in and migrate down. We also have a problem with the water somehow getting between the copper canopy and the chimney. We haven't been able to fix this yet because we are constantly renting." (Id. ¶ 53.) Coston responded to a question concerning the furnace room near the chimney showing signs of rust and flooding, stating on behalf of Michael Miles and Nancy Cloud: "The chimney has an open decorative co[p]per cover. When it rains the water comes in, but it hasn't been a problem."

(Id. ¶ 54.) Michael Thompson was told through the brokers that the window in the garage had been left open causing water to come in. (Id. ¶ 55.)

On July 23, 2008, Michael Miles and Nancy Cloud signed a second Seller's Property Disclosure form, which was provided to Michael Thompson on August 7, 2008. (Id. ¶ 56; July 2008 Disclosure, Doc. No. 30-10.) Thompson qualifies this statement by simply questioning the completeness and veracity of the second disclosure form, without record citations. (PSMF ¶¶ 53 – 61.) In the August 2008 Seller's Property Disclosure form, under Section V (Roof), it states: "The copper canopy and stonework leaked at one time." (DSMF ¶ 57.) Also under Section V (Known Material Defects), it states: "The flue in the fireplace in the study was left open at one time." (Id. ¶ 58.)

Both the 2007 and 2008 Seller's Property Disclosures state: "Neither Seller nor any Broker makes any representations as to the applicability of, or compliance with, any codes of any sort, whether state, municipal, federal or any other, including but not limited to, fire, safety, building, electrical or plumbing." (Id. ¶ 59.) Both the 2007 and 2008 Seller's Property Disclosures state that the disclosures do not constitute a warranty of the condition of the property and do not constitute part of the contract between the parties. (Id. ¶ 60.)

Both Nancy Cloud and Michael Miles say they did not see any water damage or water intrusion to the house. (Id. ¶ 61.) Cloud and Miles maintain they became aware of claims of water intrusion or damage after they had signed the first Seller's Property Disclosure form. (Id. ¶¶ 62-65.) However, they deny any awareness of mold issues with the property. (Id. ¶¶ 69-70.) Gallant testified that he told Miles about mold on the third floor of the Carriage House (the location where Barter reported water damage associated with a window). Gallant also testified

that Miles told him to fix it and that he, Gallant, removed and replaced sheetrock in that location. (PSMF ¶ 70;  Gallant Dep. at 47-48, Doc. No. 30-12.)

In light of the concerns that were identified, Michael Thompson sought a reduction in the purchase price.  According to Thompson, he sought the reduction based entirely on the fact that all of the windows in the main house needed to be replaced.  (DSMF ¶ 73;  PSMF ¶ 73.)  In any event, Miles and Cloud would only agree to any further reduction in the sale price if the property was purchased "as is" so that Thompson could not come back to them regarding the property.[3] (DSMF ¶ 74.)  Michael Thompson understood "as is" to mean that the sellers did not want any responsibility for any bad things that might happen afterward.  (Id. ¶ 75.)  On September 8, 2008, the parties amended the Purchase and Sale Agreement by signing the Investigation Contingency Amendment, which lowered the sale price by $190,000.  (Id. ¶ 76;  Doc. No. 1-8.[4])

Paragraph 12 of the Purchase and Sale Agreement (Doc. No. 1-5) is titled "Due Diligence."  It encouraged the buyer to "seek information from professionals regarding any specific issue or concern."  It indicates that the seller does not make "any warranties regarding the condition, permitted use or value of Sellers' real or personal property."  Thereafter, paragraph 12 enables the buyer to make an offer subject to certain investigations, retaining the right to withdraw from any resulting contract if he or she is not satisfied with the results on the investigations.  Among other investigations specified by Thompson were the following:  (a) General Building;  (b) Chimney;  (g) Air Quality, (i) Mold, and (q) Code Conformance.  In the absence of investigations, the Agreement provides that the buyer is "relying completely upon

[3]    Thompson attempts to qualify this statement by arguing that the defendants insisted on an "as is" provision because they knew all of the problems and defects at Seascape and sought to sell the property without disclosing them.  (PSMF ¶ 74.)  However, the record citations in support of this qualification, standing alone, do not support the inference the plaintiff seeks to have drawn. If anything, this qualification merely acknowledges the significance of executing a purchase and sale containing an "as is" provision respecting all improvements.

[4]    Defendants cite paragraph 46 of Plaintiff's Complaint and Plaintiff does not deny that the Investigation Contingency Amendment was accepted by both parties.

Buyer's own opinion as to the condition of the property." Lastly, for present purposes, paragraph 19 of the Agreement contains an integration clause, titled "Prior Statements," which reads: "Any representations, statements and agreements are not valid unless contained herein. This Agreement completely expresses the obligations of the parties."

Section II of the Investigation Contingency Amendment (Doc. No. 1-8) provides that the buyer requested modification of the Purchase and Sale Agreement as follows: "Reduce purchase price by $190,000, the improvements on the property to be sold 'as is,' satisfactory investigation re other rights over Graff Road + rights affecting southerly septic leach field easement within 7 business days." It thereafter states that, if accepted, the buyer (Thompson), "agrees that the Agreement will no longer be conditioned on paragraph 12, sub a, b, g, i."[5]

On October 14, 2008, the parties closed on the purchase and sale. (Id. ¶ 78.) Michael Thompson took possession of the property on October 14, 2008, and spent the night at the property on October 14, 2008. (Id. ¶ 79.) When Michael Thompson spent the night at the property on October 14, 2008, he did not see any concerns with the property. (Id. ¶ 80.)

Thompson filed a thirty-five paragraph statement of additional material facts. The first three paragraphs pertain to Michael Gallant's background and qualifications. Miles and Cloud admit these statements with minor qualifications/quibbles. According to Thompson, Gallant was never the general contractor on the Seascape project. (PSAMF ¶ 1.) Miles and Cloud qualify this to state that Gallant was the "builder for the property." (DRS ¶ 1.) Gallant had no written contract to act as a general contractor on the Seascape project. Gallant had no defined scope of work and he has never been involved in a construction project that identified the scope of work,

---

[5]       The copy of the Amendment is unclear, in my view, with respect to whether Thompson's waiver extended to subparagraph g or q. The parties have not made anything of this. Given the nature of the concerns raised in the inspector's report (Mr. Barter does not appear to have addressed air quality), it seems reasonable that the relevant subparagraph would be q rather than a g because q addressed "Code Conformance." On the other hand, g comes before i in the alphabet and it is therefore likely that the waiver concerns "Air Quality." In any event, it does not appear to change the analysis.

specifications, project time line or payment terms.  Gallant had no prior experience being a general contractor.  Gallant was simply an employee of Miles and Cloud who performed various maintenance-type jobs at their two inns in Bar Harbor, Balance Rock Inn and Ledgelawn Inn. (Id. ¶ 2.)  Gallant did not design any aspects of the Seascape project.  He did not modify any of the Fuller plans.  In fact, aside from some rudimentary design and drafting courses that he took at high school, Gallant has no experience with design or architecture.  Rather, with respect to his role on the Seascape project, Gallant acted as a laborer and he simply followed orders, and he did what Miles told him to do because he was paid by Miles and Cloud as their general employee. (Id. ¶ 3.)

On the permit application Miles was listed as the general contractor on the Seascape project and Miles believed this was appropriate since he was hiring a builder to build the building.  (PSAMF ¶ 4;  DRS ¶ 4.)  Miles applied to the Town of Bar Harbor Planning Department for a building permit in which he signed as owner and "general contractor" and the permit was issued to him in that capacity in or about January 2000.  (Id. ¶ 5.)  Miles then engaged the overwhelming majority of the subcontractors who would work on the Seascape project.  Miles made the decisions concerning the project.  He paid each and every subcontractor. (Id. ¶ 6.)  The notes accompanying the Fuller plans call for the involvement of various specialties and experts with the project development, including experts to assess the quality of the soil and input from a geotechnical engineer, among other specialized trades.  Miles viewed these notes as suggestions and he did not read them or review them with Gallant.  (Id. ¶ 7.) Miles chose not to engage or consult with any such specialties, including a soil expert or a geotechnical engineer.  (Id. ¶ 8.)

From 2005 through to August 2008, Miles and Cloud continued to own Seascape and

would rent it to tenants on a short-term basis.  (Id. ¶ 10.)  Gallant, in his utility role as general

maintenance person for the Miles and Cloud's income properties, would act as caretaker of

Seascape and would report to them each time any issue arose at Seascape that required attention

or expense.  (Id. ¶ 11.)

In or about late May or early June 2008, Thompson learned about Seascape.  (Id. ¶ 12.)

At the time, Seascape was being marketed for sale by a Bar Harbor realty company called

the Swan Agency.  Pat Coston and Kim Swan were the listing agents.  (Id. ¶ 13.)  The property

was listed for sale for $3,500,000.00, and promotional materials were developed by the Swan

Agency.[6]  (Id. ¶ 14.)  Additionally, in or about 2008, Miles and Cloud, and/or Swan, participated

in a featured article published in Portland Monthly Magazine in which Seascape was featured,

including being described as a "picture-perfect stone fantasy crafted in 2000 by Balance Rock

Inn owners Mike Miles and Nancy Cloud."  Miles and Cloud deny that they ever told anyone

---

[6]        This paragraph is part of defendants' properly postured  request to strike five separate statements of fact in
plaintiff's statement of additional fact.   I have repackaged the statement of fact to include only admissible evidence,
based upon the original statement, the proper request to strike, and the response thereto, the only necessary
pleadings.  The ensuing battle between the parties over summary judgment practice culminates in defendants' totally
unnecessary and counterproductive, "Motion to Strike Plaintiff's Response to Defendants' Request to Strike" (Doc.
No. 44) which I am now denying.  Plaintiff, as is his right under Local Rule 56 (e), filed his response to the
defendants' request to strike (Doc. No. 41), and the defendants found it objectionable, giving rise to their additional
motion.  The Local Rule contemplates that the summary judgment record ENDS with the nonmovant's response to a
request to strike.

        The dispute over this particular paragraph (¶ 14) is a classic example of much ado about nothing.  In the
original statement of additional fact plaintiff said the promotional materials had appeared in the New York Times or
the Wall Street Journal, based upon information and belief and cited his verified complaint.  Obviously this record
citation is improper and does not contain the sort of personal  knowledge that necessarily accompanies admissible
evidence.  Thompson's actual testimony under oath, the proper record citation, would have been that he had seen the
property advertised online or in newspapers.  (Thompson Dep., at pp. 26-27.)  Why anyone thinks this is relevant to
the summary judgment motion is beyond me.  Plaintiff then attempted to cure the deficiency by attaching a new
exhibit, Exhibit A, to his response to the request to strike, which simply showed that Swan Agency developed
promotional materials.  Defendants felt the overwhelming need to respond to this simple fact with their motion to
strike the response, asserting that plaintiff had gone beyond the parameters of Local Rule 56(e).  Since Local Rule
56 (e) anticipates, "[a] response to a request to strike shall be strictly limited to a brief statement of the reasons(s)
why the statement of fact should be considered and the authority or record citation in support," plaintiff's three-page
response, addressing all five requests to strike, with four record exhibits attached could arguably be within the rule's
strictures.  The point is, this Court will determine the undisputed *material* facts based on the record of *admissible*
evidence compiled by the parties. The subsequent defendants' motion to strike the response to the request to strike
was unnecessary and clearly in contravention of Local Rule 56(e) which disallows motions to strike in the context of
summary judgment practice.

they "crafted" their home and I do not read the statement of fact to state anything other than that the article attributed the "crafting" of the home to Miles and Cloud, a fair characterization based upon the evidence in the record. (Id. ¶ 15.)

In or about mid-July 2008, Thompson and his wife, Kathleen Thompson, traveled to Bar Harbor and met with another broker at Swan named Gail Caruso. (Id. ¶ 16.) The Thompsons received certain information concerning Seascape, including the Seller's Property Disclosure form, dated September 2007. In that form, the Defendants provided little additional information concerning the property. The form itself provides that "Seller shall be responsible and liable for any failure to provide known information regarding known material defects to the Buyer." (Id. ¶ 17.) The Defendants failed to provide any information about the water damage and moisture intrusion problems concerning Seascape. (Id. ¶ 18.) Miles and Cloud maintain they became aware of the water and moisture issues only after they signed the 2007 Seller's Property Disclosure. (Defs.' Reply SMF, ¶ 18.) In response to certain inquiries from the Thompsons, the Defendants completed and signed a second Seller's Property Disclosure form, dated July 23, 2008, in which they provided additional information. Miles and Cloud also provided additional information through emails and through their broker. (Id. ¶ 19.) In particular, in the first Seller's Property Disclosure form, the Defendants stated that there were no "known material defects" concerning the physical condition of the property. However, in the second disclosure form, the Defendants provided different information in the same section of the form, and instead disclosed that the fireplace in the study had leaked "at one time" due to a flue being left open. (Id. ¶ 20.) In both disclosure forms, there was a space to indicate any "moisture or leakage" in the roof. The 2007 form was left blank on that line. (Id. ¶ 21.) The Defendants disclosed some additional

information in the second form, but indicated only that "the copper canopy and stone work leaked." (Id. ¶ 22.)

Recognizing the significance of the Barter home inspection report Thompson states that Barter noted that the inspection was "visual only" and that he only viewed areas that were accessible at the time of inspection. (PSAMF ¶ 27.) Barter noted that no destructive testing or dismantling of building had taken place. (Id. ¶ 28.) Barter also noted that because the lower level of the main house was finished any inspection of the foundation or floor structure was precluded. (Id. ¶ 29.) In his report, Barter noted that the inspection of the main house was limited, including that structural components "concealed behind finished surfaces could not be inspected." (Id. ¶ 30.) He also noted that "[o]nly a representative sampling of visible structural components were inspected," and that there was no access to the roof space or attic, or side areas of the attic. (Id. ¶ 31.) In his report, Barter noted that evidence of prior leaks may be disguised by interior finishes and that many aspects of the underside of the roof sheathing were not inspected for evidence of leaks. (Id. ¶ 32.) After the inspection by Barter, Thompson engaged a contractor to inspect the windows. It was determined that the windows were only single pane and it was recommended to Thompson that he remove and replace all of the windows in the main house. (Id. ¶ 33.)

Since the parties closed on the transaction on October 14, 2008, Thompson has spent about $1,700,000.00 in repairs. (Id. ¶ 34.) Thompson asserts the following:

> The numerous defects and problems that were uncovered after Thompson took possession are systemic and all stem from the substandard and defective construction methods employed by the general contractor - Miles - during the initial construction of Seascape. In particular, and without limitation, the foundation beneath the main house consists of sand that was poured over loose material such as rock fragments and tree stumps, and as such, the house was practically suspended in air due to footings sinking and sliding out from

underneath the home. Additionally, the inadequate and substandard manner in which the house was water-proofed has led to massive water intrusion and moisture resulting in mold growth and contamination.

(Id. ¶ 35, citing complaint.) This paragraph, in my view, is nothing but argument and in any event is not supported by citation to admissible evidence. In his response to the request to strike this paragraph, Thompson turns, for the first time in the summary judgment process, to the deposition of Joshua Scott, Thompson's contractor who has done repair work on Seascape. (See Doc. No. 41-4.) The cited portions of Scott's testimony do not necessarily support the assertions in this statement of material fact, but he provides information about the repair work he has done on Seascape including applying cedar shingles on the guesthouse, replacing windows, repairing problems with the deck, and his discovery of mold under the carpeting in many of the rooms. From the record testimony as a whole it is fair to conclude that Thompson has expended a significant sum of money on repair or maintenance work at Seascape since he bought the premises and that some of problems can be fairly attributed to faulty construction and/or poor planning or design.

### THE COURT'S PRIOR ORDER ON THE MOTION TO DISMISS

On September 27, 2010, this Court entered its Order on Defendant's Motion to Dismiss, which addressed, among other claims, the three counts that remain disputed in the pending motion. (Doc. No. 18.) The Court's prior Order necessarily relied upon the allegations set forth in the verified complaint. In its Order, the Court concluded that Thompson failed to state claims of breach of an implied covenant of good faith and fair dealing (Count II) or promissory estoppel (Count V), but that the Complaint otherwise set forth plausible allegations concerning breach of contract (Count I), misrepresentation (Counts III and IV), and unfair trade practices (Count VI).

I flag this Order only because this case was transferred to the current presiding Judge after the Order issued on the motion to dismiss.

**DISCUSSION**

The claims that require discussion are breach of contract, fraud, negligent misrepresentation, Counts I, III and IV, respectively. In large measure, the parties are fighting over the legal significance of executing a purchase and sale agreement containing an explicit statement that improvements on the property are to be accepted "as is." Miles and Cloud, understandably, rely on the fact that their purchase and sale agreement had an integration clause, did not promise code compliance, extended no warranties and, most importantly, specified that the property was to be accepted as is, insofar as property improvements were concerned. (Def.'s Mot. at 2-5.) Thompson, on the other hand, maintains that an "as is" provision only waived his rights with respect to those conditions or defects in the property of which he had been notified at the time of execution. He further contends that he was not aware of the true extent of the property's defects because they were intentionally withheld from him despite an alleged duty to disclose. (Pl.'s Opposition at 1-4, Doc. No. 35.) I am persuaded in this case that neither Miles nor Cloud owed Thompson a heightened duty of disclosure because of Miles's participation in construction, that the disclosures they offered in connection with the purchase and sale negotiation did not deprive them, as sellers, of the protection of the common law doctrine of caveat emptor or expose them to tort liability, and that the record does not support the core claim for breach of contract.

**A. Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).  "Once a properly documented motion has engaged the gears of Rule 56, the party to whom the motion is directed can shut down the machinery only by showing that a trialworthy issue exists."  McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995) (citing Nat'l Amusement Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995)).  If the evidence of record is sufficient to support a judgment in favor of the non-moving party on one or more of his claims, then there is a trial-worthy controversy and summary judgment must be denied to the extent there are supported claims.  Unsupported claims are properly dismissed. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

**B.      Breach of Contract**

The contract in dispute in this case is the Purchase and Sale Agreement and the modification thereto identified as the Investigation Contingency Amendment.  A straightforward reading of these two documents is that Thompson, in exchange for Miles and Cloud's agreement to accept $190,000.00 less for Seascape, agreed to accept the improvements on the property "as is" with respect to general building quality, chimney condition, code conformance and mold. Also included within the contract was a representation that, in the absence of inspections, the buyer was "relying completely upon Buyer's own opinion as to the condition of the property." (Doc. No. 1-5, ¶ 12).    I conclude that the terms of the Purchase and Sale Agreement and the Investigation Amendment Agreement are clear and unambiguous and "any representations, statements and agreements are not valid unless contained herein."  (Id. ¶ 19).  However, as part of the amendment, the parties specifically agreed that all other terms and conditions of the purchase and sale agreement were to remain in full force and effect.  Included within the

agreement at paragraph 3 was a promise by the seller that all the mechanical components of heating sources, which would include any furnace, would be operational at the time of closing.

Thompson partially bases his breach of contract claim not on the terms of the written contract between the parties, but on an implied warranty of habitability that he says Miles is subject to as the builder-vendor of a new home. Maine has adopted an implied warranty of habitability in those situations involving a commercial builder-vendor and a purchaser and recognizes a cause of action based on the breach of this implied warranty involving the construction of new homes. Banville v. Huckins, 407 A.2d 294, 297 (Me. 1979). However, the Maine Law Court has specifically refused to extend that implied warranty to a homeowner who has had no part in the construction of the residence because it "offends considerations of fairness and common sense to do so." Stevens v. Bouchard, 532 A.2d 1028, 1030 (Me. 1987). The summary judgment record establishes that Seascape was built between 2000 and 2003, inhabited by Miles and Cloud through 2004, and used for seasonal rental purposes thereafter until purchased by Thompson in 2008. By no means does this purchase qualify as the sale of a new home. Furthermore, nothing in the summary judgment record assigns to Nancy Cloud any role in the construction or oversight of the construction of these premises. As plaintiff has repeatedly indicated, Michael Miles identified himself as the general contractor, not Nancy Cloud.

The issue then comes down to whether the cause of action for breach of an implied warranty of habitability should be extended to someone in the situation of Michael Miles, the "general contractor/owner" cum seller, of an owner-occupied dwelling. Had Miles and Cloud actually retained a commercial builder to construct their new home, there is no Maine case that suggests that the warranty of habitability for new construction extends to subsequent purchasers of an already lived-in house five years after the completion of construction. Nor is there any

Maine case where an implied warranty of habitability was extended to an owner such as Miles who held a general oversight role in the construction of his own home, then subsequently sold his personal residence.

In this case Miles identified himself as the general contractor responsible for this construction project and chose to eschew consultation with engineers and/or architects. The question of whether the implied warranty of habitability should, in these circumstances, be extended to Thompson plows new ground under Maine law. Under general principles of common law, sellers of real estate have no obligation to disclose property defects to buyers, and the Maine Law Court has generally been reluctant to extend that obligation. See Kezar v. Mark Stimson Associates, 1999 ME 184, ¶ 15, 742 A.2d 898, 903. I can see no reason to extend the obligation of providing an implied warranty of habitability on the facts put forth in this case, even assuming, viewing the evidence in the light most favorable to Thompson, that Michael Miles, as general contractor, was in a position where he should have known of the alleged construction defects, including but not limited to the foundation, the moisture barriers, and ventilation in a furnace room. Miles quite simply was not a commercial builder of a new residential home built for use by another and the Maine Law Court has never extended the warranty of habitability beyond those facts. The construction of a multi-million dollar personal residence by the owner on oceanfront property is legally no different than the construction of a $ 50,000.00 stick built home in a subdivision in rural interior Maine. The owner who elects to act as the "general contractor" and oversees the construction of his own personal residence does not, under current Maine law, provide an implied warranty of habitability to a subsequent purchaser five years later.

The remaining contractual issue left unresolved by the earlier motion to dismiss relates to the operational status of the furnace as of the date of closing. (See Doc. No. 18, at 12, Order on Motion to Dismiss.) Thompson has not developed any argument in connection with this issue in response to the summary judgment motion, other than to state that defendants have never refuted his claim that the furnace was not operational or properly ventilated. (Resp., Doc. No. 35, at 19.) The only summary judgment record evidence I can find on this point is submitted by the defendants in support of their motion and is found in the Barter report, stating that the furnace in the carriage house "was operated," and in Kathleen Thompson's e-mail of September 8, 2008, noting issues with the furnace in the Carriage House needing replacement/reventing. (Doc. No. 30-5 at 9 and 30-6.) In his verified complaint, Thompson described the problem with the furnace by noting that it was "improperly constrained in the guest house in violation of applicable code and without proper ventilation thereby causing dangerous carbon monoxide production." (Compl. at 10, ¶ h.) Even assuming that Thompson has the necessary expertise to determine the carbon monoxide level in the carriage house, the *summary judgment record* does not include any statement of fact even suggestive of this problem. Thompson has simply not put forth record evidence sufficient to create a dispute of fact over whether or not the furnace was operational at the time of closing. At best the summary judgment record allows an inference that there were known "issues" regarding the furnace prior to the closing date, but that it was operational. There is no factual basis in this record to conclude that any of the material terms of this contract were breached.

**B.	Misrepresentation**

The claim of fraud (Count III) and the claim of negligent misrepresentation (Count IV) both sound in tort and are in most respects similar.  I have grouped them for purposes of discussion because the dispositive issue, as I see it, applies equally to either claim.

In order for Miles and Cloud to be found liable for fraud, Thompson must prove by clear and convincing evidence that they (1) made a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard as to whether it is true or false (4) for the purpose of inducing another to act or refrain from acting in reliance upon it, and (5) that Thompson justifiably relied upon the representation as true and acted upon it to his detriment. St. Francis de Sales Fed. Credit Union v. Sun Ins. Co., 818 A.2d 995, 1003 (Me. 2003) (citing Letellier v. Small, 400 A.2d 371, 376 (Me. 1979)).  A claim of fraud is subject to a heightened standard of proof by clear and convincing evidence, which requires that the plaintiff "place" in the factfinder "an abiding conviction" that his factual contentions are "highly probable".  Taylor v. Comm'r of Mental Health & Mental Retardation, 481 A.2d 139, 153 (Me. 1984) (quoting Colorado v. New Mexico, 467 U.S. 310, 316 (1984)).

In order to be found liable for negligent misrepresentation, Thompson must prove (1) that there was a transaction in which Miles and Cloud had a pecuniary interest, (2) that they provided false information to Thompson in connection with the transaction, (3) that they did so without exercising reasonable care or competence, (4) that Thompson justifiably relied on that false information; and (5) that Thompson suffered pecuniary loss as a result.  Rand v. Bath Iron Works Corp., 2003 ME 122, ¶ 13, 832 A.2d 771, 774;  Chapman v. Rideout, 568 A.2d 829, 830 (Me. 1990)).  The primary distinctions between the two torts are that fraud is an intentional tort and

that fraud is subject to the heightened standard of proof rather than proof by a mere preponderance of the evidence.

Pursuant to Maine law, a seller of real estate is under no duty to disclose known defects in the premises unless there exists "some special relationship" with the potential buyer or the seller has engaged in "affirmative statements or acts intended to deceive." Stevens v. Bouchard, 532 A.2d 1028, 1030 (Me. 1987); see also Eaton v. Sontag, 387 A.2d 33, 38 (Me. 1978) ("[I]t is not fraud for one party to say nothing respecting any particular aspect of the subject property for sale where no confidential or fiduciary relationship exists and where no false statement or acts to mislead the other are made."). In this case, there is no evidence to support a finding that Miles and Cloud were in a special relationship with Thompson. In all respects, this was an arm's length real estate transaction. With respect to the second exception associated with affirmative statements or acts intended to deceive, the common law sometimes gives rise to a duty to disclose when the seller has made a partial disclosure. Bradley v. Kryvicky, 574 F. Supp. 2d 210, 220 (D. Me. 2008). As stated by this Court in Bradley: "It is a well-established principle of tort law that one who voluntarily elects to make a partial disclosure is deemed to have assumed a duty to tell the whole truth, i.e., to make full disclosure, even though the speaker was under no duty to make the partial disclosure in the first place." Id. (citing, inter alia, Restatement (Second) of Torts § 551(2)(b) (1976) and V.S.H. Realty, Inc. v. Texaco, Inc., 757 F.2d 411, 414-15 (1st Cir. 1985) (applying Massachusetts law)).

Thompson, it must be noted, cites none of the law pertaining to the duty to make a full disclosure when a partial disclosure would mislead. Instead, Thompson persists in the idea that Miles and Cloud owed him a duty to disclose because Miles was the builder of the premises and identified himself and behaved in many respects as the "general contractor." That basis for

imposing a duty of disclosure is flawed in this case, for reasons explained in the discussion of the contract claim. Thompson's failure to brief the specific tort issue of a duty to disclose arising from partial disclosure would justify the Court in treating this particular legal issue as waived.

Should the Court dislike the option of imposing a waiver on Thompson for his failure to develop a legal position, I would still recommend that the Court grant the motion for summary judgment with respect to both tort claims. In the final analysis, the record developed at summary judgment is too generalized and nonspecific to support the imposition of a duty of disclosure in this case or to identify what material information was known to Miles or Cloud that should have been disclosed or that, if disclosed, would have supplied Thompson with material information he did not already have. Because of the way the summary judgment record has been assembled and the dearth of admissible testimony dealing with the nature of the claimed defects, it is difficult to ascertain the scope of Thompson's misrepresentation claims. Clearly, some of the claimed defects were or should have been known to Thompson prior to the sale. I have separated the allegations into groups to illustrate this point.

### 1.      The deck and windows

The report of Thompson's inspector informed Thompson that the "deck/porch appears to be somewhat haphazardly designed/constructed." (Barter Report at 8, Doc. No. 30-4.) Furthermore, the problem with the windows was certainly known and revealed to Thompson prior to the sale. An original asking price of 3.5 million was negotiated down to 2.9 million dollars. On these facts there is simply insufficient evidence for Thompson to make a misrepresentation claim and show reasonable reliance on any representations made by Cloud or Miles about these sorts of issues. Not only is there a lack of reasonable reliance, the record does

not even demonstrate that either Cloud or Miles made any representations, false or otherwise, concerning things like the deck or the windows.

It appears to me that there are only two claims concerning fraudulent concealment or misrepresentation that require further analysis, namely problems with the foundation and the moisture intrusion/mold-related problems arising from faulty construction or maintenance.  I turn first to foundation related problems.

### 2.    *The foundation*

The only summary judgment record evidence concerning defects with the foundation is in the form of Thompson's inadmissible hearsay assertion that the foundation was poured on top of sand and tree stumps, which perhaps arises from Joshua Scott's hearsay assertion that an unknown individual told him that Michael Miles told the people who poured the foundation to put eight cords of wood under the foundation in place of clean fill.  (Scott, Dep., Doc. No. 41-4 at 43.)  Apparently, reading between the lines, there were substantial problems with retaining walls and the manner in which the foundation was poured on what appears to have been a very challenging building lot.  There is no indication that Miles or Cloud provided any false information about the foundation pouring process or even failed to disclose any information they had about that process.  Viewing the evidence most favorably to Thompson, the best that could be said is that Miles was negligent as a general contractor and did not properly seek the advice of engineers and architects before he set about siting his home on the lot in question.   He did nothing to fraudulently represent that the home had been built by a so-called "licensed" general contractor or to suggest that engineers had been consulted prior to the commencement of construction.  If the person who Miles hired to pour the foundation did it improperly, there is no admissible evidence to suggest that either Miles or Cloud was aware of that fact.  Indeed, Miles

and Cloud had owned the home for over five years and there is no evidence that either had ever experienced any problems with the foundation.

### 3. *Moisture and mold*

The record evidence concerning moisture intrusion and mold problems presents a closer question. In their 2008 disclosure, Miles and Cloud identified one roof condition and one defect associated with the chimney in the study. In addition to these disclosures, Miles and Cloud also informed the Thompsons about water intrusion from an ice dam, water intrusion from the furnace chimney, and water intrusion resulting from a window in the carriage house being left open. It must also be acknowledged that Barter flagged numerous moisture-related concerns for the Thompsons to chew on. Considering all of this information and the non-specific nature of the moisture or mold remediation efforts undertaken by Thompson subsequent to the sale—at least as far as they have been identified in their summary judgment statement—a reasonable factfinder would be unable to infer that Miles or Cloud knowingly supplied Thompson with false information about an existing defect or that they withheld some material information known to them that they became obliged to disclose on account of a partial disclosure on their part. For example, the only reference in the 2008 disclosure concerning "moisture or leakage" falls under "Roof" and Miles and Cloud disclosed a known issue with respect to the copper canopy and stonework. I am unable to say after reviewing Thompson's evidence that there was another roof location having a leak that Miles and Cloud knew or should have known about. Additionally, Thompson's brief in opposition alludes to "inadequate sheathing" (Pl.'s Opposition at 17), but, once more, the record is simply not developed in a way that would permit a finder of fact to connect the dots between a specific known defect and a partial disclosure designed to hide that

defect. The word sheathing does not even appear in the parties' statements except to indicate that the inspector did not inspect the underside of the roof sheathing.

There is record evidence that the moisture problems and mold-related problems addressed by Michael Gallant were greater than those described by Miles and Cloud. Specifically, there is the issue of water damage near the third floor window of the carriage house, which evidently was left open at some point in time. On this issue, Gallant testified that Miles told him to fix the problem and that he removed and replaced interior sheetrock. However, even this evidence does not describe knowledge on the part of Miles that there was a latent defect existing at the time of the sale. Moreover, there are multiple indications that Thompson was aware of the presence of "mold," because Kathleen Thompson's emails highlight this concern. The summary judgment statements do not otherwise identify any specific mold defect. The only exception is a generalized reference to "water intrusion and moisture resulting in mold growth and contamination" for which Thompson cites, exclusively, his complaint. Although verified, the allegations in question, paragraphs 10 through 13, do not allow for a meaningful evaluation of what specific defects Miles or Cloud would have been aware and somehow disguised behind a partial disclosure.

In effect, my analysis of the record put before the Court is that rather than having a case built on an abundance of non-disclosed defects, Thompson's case ultimately falls back on a moisture intrusion problem about which he had a significant amount of information. Even with this particular issue, Thompson fails to adequately develop his claims. His failure stems, I believe, from a false premise that Mills and Cloud were subject to a heightened duty to disclose because Mills served as his own builder yet failed in many respects to conform to the standard specified in the code or observed by professional contractors. Because I am unable to point to

any specific moisture-intrusion defect in the summary judgment statements for which there also exists evidence of a known non-disclosure by Miles and Cloud that can be coupled with a misleading partial disclosure, my recommendation to the Court is to grant the motion for summary judgment on all of the remaining counts.

## Conclusion

Based upon the foregoing, judgment should enter for the defendants on the remaining claims against them.  I now recommend that the Court grant summary judgment to the defendants on Count I, breach of contract, Count III (fraud), Count IV (negligent misrepresentation) and Count VI (unfair trade practice).  I also deny the motion to strike.


NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

December 30, 3011